No. 44,437

Betty Smyth, *Appellant*, v. Constance Winters Schubmehl Thomas et al., *Appellees and Cross Appellants*, and Victoria Sue Smyth and Elizabeth Eve Smyth, Minors, *Appellants*.

(424 P. 2d 498)

Opinion filed March 4, 1967.

Lester C. Arvin, of Wichita, argued the cause, and *Kay K. Arvin* and *Rodney H. Busey*, both of Wichita, were with him on the brief for Betty Smyth, appellant.

*Eugene L. Pirtle*, of Wichita, argued the cause and was on the brief for Victoria Sue Smyth and Elizabeth Eve Smyth, appellants.

*Paul R. Kitch* and *Roetzel Jochems*, both of Wichita, argued the cause, and *Willard B. Thompson*, *Hugo T. Wedell* and *Richard A. Loyd*, all of Wichita, were with them on the brief for the appellees and cross-appellants.

The opinion of the court was delivered by

Price, C. J.: This is an action to quiet the title to real estate in the city of Wichita.

The question in the case concerns the construction of certain language contained in item X of a will.

Allegations of the pleadings need not be detailed. The contentions of the parties will be evident as the facts are developed.

On April 5, 1932, Charles H. Smyth, a resident of Wichita, executed his last will and testament. Mr. J. Wirth Sargent, an attorney of Wichita, was the scrivener. The testator died on November 5, 1933, and his will was admitted to probate. He was survived by his wife Anna, a daughter Maebell Smyth Hyde, a daughter Constance Jane Harrington Winters, and a son Charles F. Smyth, hereafter referred to as Charles.

After providing for a number of bequests, the will bequeathed and devised to the wife, Anna, a life estate in all of the remaining property.

In item VIII of the will, after the death of Anna, a life estate in certain described real property was devised to the daughter Maebell, with remainder over in fee simple to such of the children of Maebell as shall survive her.

In item IX of the will, after the death of Anna, a life estate in certain described real property was devised to the daughter Constance, with remainder over in fee simple to such of the children of Constance as shall survive her.

The property devised in the foregoing portions of the will is not involved in this action.

Item X of the will—the provisions of which are the basis of this action—reads:

"X

"After the death of my beloved wife, or at my death, in the event my wife predeceases me, I devise a life estate in and to the following described real estate, situated in Sedgwick County, Kansas, to-wit:

(Description omitted.)

to my beloved son, Charles F. Smyth, he to have the rents, issues and profits therefrom during his life time; paying all taxes, insurance and other charges on said buildings; with remainder over in fee simple to the lawful issue of said Charles F. Smyth born in wedlock, who may survive him, *provided that in the event said Charles F. Smyth shall die without such issue, then the remainder in fee simple to the children surviving my daughters, Constance Jane Harrington Winters and Mae bell Smyth Hyde,* per capita, share and share alike, and subject to the payment to Margaret Smyth, the present wife of Charles F. Smyth, if she survive him, of the sum of fifty thousand dollars ($50,000.00), said sum to be raised by placing a mortgage upon the above described property by the then owners thereof, if necessary, provided further that if Margaret Smyth shall predecease my son, Charles F. Smyth, then said property shall be

charged with a payment of $25,000.00 to Barbara Smyth, daughter of Margaret Smyth, if said Barbara Smyth survives my son, said son to be raised as aforesaid." (Emphasis supplied.)

Under item XIII of the will, the wife Anna is the residuary legatee and devisee of the estate. She was named executrix, and she executed her written consent to the will. The final paragraph of the will provides:

" . . . It is further my will that J. Wirth Sargent be permitted to testify concerning the provisions of this will, and that his interpretation shall be prima facie evidence thereof."

Mr. Sargent was a subscribing witness to the will.

As stated, the testator was survived by his wife Anna and his three children, Maebell, Constance and Charles.

On September 29, 1937, Anna, as residuary devisee under the will—and reserving to herself a life estate, including the rents and profits—executed to Charles a quit-claim deed to the property described in item X of the will, above, in the following language:

" . . . he, the said Charles F. Smyth, to have the rents, issues and profits therefrom during his lifetime, paying all taxes, insurance and other charges on said buildings; with remainder over in fee simple to the lawful issue of said Charles F. Smyth, who may survive him; *provided, that in the event said Charles F. Smyth shall die without such issue, then the remainder in fee simple to the children of my daughters, Constance Jane Harrington Winters and Mae Bell Smyth Hyde, who shall survive Charles F. Smyth,* per capita, share and share alike; and subject to the payment of Margaret Smyth, wife of Charles F. Smyth, if she survive him, of the sum of $50,000.00, said sum to be raised by placing a mortgage upon the above described property by the then owners thereof, is necessary, provided, further, that if Margaret Smyth shall predecease Charles F. Smyth then said property shall be charged with the payment of $25,000.00 to Barbara Smyth, daughter of Margaret Smyth, if said Barbara Smyth survives my son, Charles F. Smyth, said sum to be raised as aforesaid.

"The consideration of this deed is love and affection and to perfect title by providing *that the remainder in fee simple shall go to the children of Constance Jane Harrington Winters and Mae Bell Smyth Hyde,* per capita, share and share alike, *who shall survive said Charles F. Smyth,* the will of Charles H. Smyth not being clear as to the contingent remainder." (Emphasis supplied.)

This deed was prepared by Mr. Sargent, the scrivener of the will, and bears his signature and notary seal on the acknowledgment. It was filed for record on December 8, 1937.

At the time the will was executed and at testator's death—Margaret Smyth (mentioned in item X of the will and in the 1937 deed

from Anna to Charles) was the wife of Charles. They were divorced in April, 1945. She is still living.

Testator's daughter, Constance, died on June 27, 1949. She was survived by two children, a daughter, Constance Winters Schubmehl Thomas, and a son, Charles Smyth Harrington, a/k/a Jerome Winters, a/k/a Jerome Harrington. These two children are still living and are of lawful age.

Testator's widow, Anna, died on October 7, 1950.

Following the 1945 divorce of Charles and Margaret—Charles, on a date not shown—was married to Betty, the plaintiff in this action.

On September 21, 1963, Charles, joined by his wife Betty, executed a general warranty deed conveying to Betty the real property described in item X of the will and in the 1937 deed from his mother, Anna, to him. It was filed for record on October 16, 1963.

Charles died on February 5, 1964. He was survived by his wife Betty and two adopted daughters, Victoria Sue Smyth and Elizabeth Eve Smyth, age 16 and 7.

Testator's daughter, Maebell Smyth Hyde, is still living. She has had four children, two of whom predeceased Charles. The other two, Ann D'Arcy Hyde Cory Eustis and Theodore Alvan Hyde are still living and are of lawful age.

It will be seen, therefore, that when Charles died in February, 1964, he was survived by his wife Betty and two adopted minor children. He also was survived by Margaret, his former wife, and by two children of his sister Maebell, and by two children of his prior deceased sister Constance.

It is the emphasized portion of item X of the will, above, which brought about this dispute.

On the one hand it is contended that should Charles not be survided by lawful issue born in wedlock, the property passes to the children of Maebell and Constance, who survive them—and, since Maebell is still living—the "infirmities" in the provision in question are obvious, and that Betty takes under the 1963 deed from Charles (and herself) to her. The two adopted children of Charles claim an interest either under the language of item X or under the law of intestate succession.

On the other hand, the four children of Maebell and Constance, who survived Charles, contend the obvious intent of the testator was that should Charles not be survived by lawful issue born in wed-

lock, the property passes to them upon his death, subject to the $50,000 payment to Margaret.

Margaret, in any event, claims a charge and lien on the property to the extent of $50,000.

Hence this law suit—and the question is—who, following the death of Charles, is the owner of the property?

At the time of trial Mr. Sargent was physically disabled and could not testify. He died a few months later.

All facts as above related having been stipulated—the parties brought the matter to a head by motions for summary judgment.

In rendering judgment the trial court found and concluded—

1. The word "issue" as used in the will of the testator and in the quit claim deed of September 29, 1937, from Anna to Charles, does not include the adopted children of Charles.

2. The will did not create a fee tail estate in Charles.

3. Item X of the will violated the rule against perpetuities.

4. The fee simple title in and to the real property in question passed to Anna, the widow of testator, as residuary devisee and legatee under the will.

5. The 1937 deed from Anna to Charles conveyed a life estate in the property to Charles with the remainder vested in the four children of Maebell and Constance.

6. Upon the death of Charles the fee simple title in and to the property passed to and vested in the then living four children of Maebell and Constance, per capita, share and share alike.

7. The deed of September 21, 1963, from Charles and his wife Betty, to Betty, conveyed to Betty only an estate in and to the property for the life of Charles.

The judgment further recites that the motion of Margaret in which she sought judgment for a charge and lien on the property to the extent of $50,000, was sustained.

In other words, the substance of the trial court's judgment was that upon the death of Charles the fee simple title passed to the four children of Maebell and Constance who survived Charles, subject to the claim and lien in favor of Margaret for $50,000.

Betty and the two adopted children of Charles have appealed.

The four children of Maebell and Constance—appellees here—although satisfied with the ultimate judgment rendered in their favor—have cross-appealed from the finding and conclusion that item X of the will violates the rule against perpetuities, and contend

that the judgment can properly be sustained not only on the theory followed by the trial court, but also on the ground of effectuating the testator's obvious intent as gleaned from the will itself—unvitiated by the rule against perpetuities.

For reasons hereafter stated, we believe that item X of the will is to be construed as meaning that following the death of Anna—the first life tenant—Charles was to have a life estate in the property in question with remainder over in fee simple to his lawful issue born in wedlock who survived him, but if he died without leaving such issue, then the remainder in fee simple should pass to the children of Maebell and Constance who survived him.

It always has been the rule that where some uncertainty or ambiguity appears in a will the law favors a reasonable construction which will uphold the will rather than one which defeats it (*In re Estate of Koellen,* 162 Kan. 395, 176 P. 2d 544). In construing a will a court should place itself as nearly as possible in the situation of the testator when he made the will, and from a consideration of that situation, and from the language used in every part of the will, determine as best it can the purposes of the testator and the intentions he endeavored to convey by the language used (*In re Estate of Thompson,* 161 Kan. 641, 171 P. 2d 294). Courts favor reasonable and consistent interpretations, rather than literal or critical interpretations which result in ascribing unnatural and unreasonable intentions to a testator (*In re Estate of Works,* 168 Kan. 539, 213 P. 2d 998). Provisions apparently in conflict should be reconciled if reasonably possible, provided an intent can be given to the various provisions which appears to be consistent with the general intent and purpose of the testator as gathered from the entire instrument (*Regnier v. Regnier,* 122 Kan. 59, 62, 251 Pac. 392; *In re Estate of Miller,* 186 Kan. 87, 348 P. 2d 1033; *Baldwin v. Hambleton,* 196 Kan. 353, 411 P. 2d 626). Doubtful expressions are not to override the obvious intent which is evident from a survey of the entire will (*In re Estate of Roberts,* 190 Kan. 248, 373 P. 2d 165). The rule also is that an obviously omitted word or words may be supplied and that employed words may be transposed in a will if to do so eliminates uncertainty and renders the various provisions reasonably consistent with each other and enables a court to effectuate a testator's realistic intent (*Regnier v. Regnier,* above; *In re Estate of Miller,* above).

The overall intent of the testator is clear. Aside from some

specific bequests, he gave his wife Anna a life estate in all property After her death each of the daughters was given a life estate in certain property with the remainder over in fee simple to their respective children who should survive them. In item X, after the death of Anna, Charles was given a life estate in the property in question with remainder over in fee simple to his lawful issue born in wedlock who survived him. Reading the will in its entirety it is clear that testator's plan and scheme was that as to the devises to his three children the remainder was to vest in each instance upon the death of the second life tenant, and it may not be said he intended that in the event Charles was not survived by such issue the title to the property in question be "suspended" until the death of both Maebell and Constance. And neither may it be said that testator intended that the rights of Margaret or Barbara—as the case may be—be held up indefinitely. It is clear that in such event then the property was to pass in fee simple to his sisters' children who survived him. Such construction involves only substitution of the word "of" for the word "surviving" after the word "children," and inserting the obviously misplaced word "surviving" after the names of the daughters, and then inserting the omitted word "Charles" after the transposed word "surviving." The particular provision in question thus would read:

"then the remainder in fee simple to the children of my daughters, Constance Jane Harrington Winters and Mae bell Smyth Hyde, surviving Charles . . ."

In fact, this construction of item X is borne out by the language of the 1937 deed from Anna to Charles—both of which instruments were prepared by Mr. Sargent. Thus, as early as 1937 the testator's true intent was interpreted and publically declared by Anna, Charles and Mr. Sargent to be as we have above concluded. In *Giese v. Smith*, 195 Kan. 607, 408 P. 2d 687, it was said:

"There is yet another rather convincing circumstance which tends to indicate the intention of the testator. It appears that the immediate children of the testator had for years placed their interpretation upon the will . . . We must assume that the children of Christian P. Smith knew more about the conditions and circumstances under which the will was drawn, and the intention of the testator, than did a grandson who attempts to place his interpretation upon the will some 55 years after the death of the testator." (p. 612)

See also *In re Estate of Dobrovolny*, 182 Kan. 138, 142, 318 P. 2d 1053.

The contentions of Betty and the two adopted children of Charles are of course premised upon the proposition that item X of the will

is not to be construed as we have concluded. Discussion of such matters therefore would be academic and would serve only to divert attention from what we consider to be the decisive issue in the case. We, however, mention briefly two points.

We are not dealing here with the rights of adopted children under the law of intestate succession (K. S. A. 59-501 and 2103), but rather with the provisions of a will which make it clear the testator's intentions were that only grandchildren of the blood were to take the property in question after the two life estates. The words "lawful issue . . . born in wedlock" found in item X of the will and "lawful issue" used in the 1937 deed from Anna to Charles, do not include the adopted children of Charles ( *Blaker v. Blaker,* 131 Kan. 833, 836, 837, 293 Pac. 517; *Woodley v. Howse,* 133 Kan. 639, 641, 642, 3 P. 2d 475).

Our construction of item X of the will disposes of the question whether it violates the rule against perpetuities. The wife Anna received a life estate—followed by a life estate in Charles. If there were no lawful issue born in wedlock to him, then the children of the two named daughters, Maebell and Constance, were to receive the fee upon the death of Charles. Anna, Charles and the daughters all were "lives in being" at the time the will was executed and at testator's death. There is no room for application of the rule ( *Goetz v. Goetz,* 174 Kan. 30, 38, 254 P. 2d 822).

Strictly speaking, therefore, that portion of the trial court's judgment holding that item X violated the rule against perpetuities is reversed. A judgment, however, correct in result, is not to be set aside on the ground it was arrived at through the process of erroneous reasoning ( *Kirkpatrick v. Ault,* 174 Kan. 701, 706, 258 P. 2d 262).

In view of our holding and construction of item X of the will, other points argued in the briefs are not in issue and require no discussion. We agree with the ultimate judgment of the trial court that upon the death of Charles the fee simple title to the subject property passed to the then living four children of Maebell and Constance, per capita, share and share alike—subject to the claim and lien thereon in favor of Margaret in the amount of $50,000.

The judgment is affirmed.

FATZER, J., concurring and dissenting: With profound respect, I express my concurrence and disagreement with the court's holding

in this case, and, although time presses, I feel obligated to state my views.

To assist the reader, Charles H. Smyth, the testator, is referred to as the testator, and Anna M. Smyth, his wife, is referred to as Anna. Mae Bell Smyth Hyde, the daughter, is referred to as Mae Bell; Charles F. Smyth, the son, is referred to as Charles, and Constance Jane Harrington Winters, the daughter, is referred to as Constance.

First, I concur in a part of the court's holdings and the corresponding portions in its opinion. In view of its conclusion of item X of the will, the court deemed it unnecessary to discuss the contention of Betty Smyth, the plaintiff. I shall state that contention as I understand it and briefly comment upon it.

The plaintiff contends the testamentary disposition in item X vested in Charles a fee tail estate and that by his conveyance of the property devised in that paragraph to her by his warranty deed of September 21, 1963, in which she joined, the fee tail estate was docked, or in legal parlance, was barred, and the fee simple title to the property passed to her under the deed of her husband. She cites and relies principally upon *Woodley v. Howse*, 133 Kan. 639, 3 P. 2d 475.

Since the will of the testator became effective upon his death on November 3, 1933, it is not affected by any provision of the Property Act of 1939. (K. S. A. 58-501, *et seq.*, and particularly 58-502 and 58-504.) The testator's will must be interpreted in harmony with the recognized law of this state existing at the date of his death. (*Delp v. George*, 158 Kan. 774, 150 Pac. 334; *In re Estate of Freeman*, 195 Kan. 190, 404 P. 2d 222.)

It is unnecessary to define an estate tail. That has been done numerous times. (*Gardner v. Anderson, Trustee*, 116 Kan. 431, Syl. ¶ 3, 227 Pac. 743.) Prior to the Property Act of 1939, the creation of a fee tail estate depended upon whether the limitation over was upon a definite or indefinite failure of issue. An indefinite failure of issue, which is an essential ingredient of a fee tail, means a failure of issue which may occur at any time, rather than at any fixed time. A definite failure of issue is when a precise time is fixed by the failure of issue, not necessarily in express terms, but inferable with reference to any particular time or event, as in the case of a devise to a designated person, but if he die without lawful issue living at the time of his death, then over. (*Coleman v. Shoemaker*, 147 Kan. 689, 78 P. 2d 905.)

In the instant case, the testator devised the property described in item X of the will to Anna for her life, and at her death, to Charles for his life with remainder over in fee simple to his lawful issue born in wedlock who may survive him, and should he die without such issue, then over. Language similar to that was construed in a number of cases such as *Klingman v. Gilbert*, 90 Kan. 545, 135 Pac. 682, and *Coleman v. Shoemaker*, supra, and, except for *Woodley v. Howse*, supra, and *Allen v. Pedder*, 119 Kan. 773, 241 Pac. 696, both of which were expressly disapproved in *Delp v. George*, supra, this court held that because the failure of issue had been definitely fixed by the testator, the limitation over was upon a definite failure of issue which created a contingent remainder, and not an estate tail. And so here. See, also, *Burnworth v. Fellerman*, 131 Kan. 186, 289 Pac. 433. I agree with the district court that item X did not create a fee tail estate in Charles and that his deed of September 21, 1963, to Betty conveyed to her only an estate in the property for the life of Charles.

I am also in accord with the court's holding that item X did not violate the rule against perpetuities. The rule against perpetuities requires that an estate to commence in the future must vest in interest within 21 years after some life or lives in being. (2 Simes, The Law of Future Interests, § 490; *Commercial National Bank v. Martin*, 185 Kan. 116, 340 P. 2d 899.) The lives in being used to measure the period can be any one of the lives mentioned in the will and the testator need not make any special intention to that effect. (2 Simes, *op. cit., supra*, § 491.) In the instant case, the lives in being include Anna, Constance, and Mae Bell, as well as Charles. Those persons were lives in being within the meaning of the rule, and, in any event, the fee simple title would vest in the remaindermen within 21 years after the death of the survivor.

I am also in accord with the court's conclusion that the words found in item X, "to the lawful issue of said Charles F. Smyth, born in wedlock" do not include Victoria Sue Smyth and Elizabeth Eve Smyth, the adopted children of Charles and Betty Smyth.

I am likewise in accord with the conclusion implicit in the court's opinion that the dominant, pervading and compelling intention of the testator and his scheme and plan in executing his will was to keep his property, both real and personal, within the family "bloodline" of his children and grandchildren. If obliged to indulge in stating a reason for what the testator did, I would suggest his

dominant intent was to prevent the "in laws" of his children and grandchildren from enjoying any part of his large and valuable estate.

The court reads item X as meaning that following the death of Anna, Charles was to have a life estate in the property described with remainder over in fee simple to his lawful issue born in wedlock who survive him, but if he die without such issue, "then the remainder in fee simple to the children of my daughters, Constance . . . and Mae bell . . . surviving Charles," per capita, share and share alike. While the court does not specifically so state, the language compels the conclusion that the alternative contingent remainder devised to the children surviving the two daughters is accelerated by the death of Charles, so that the children take a vested remainder upon that event. I do not agree. It is not possible to derive any such meaning from the words the testator used.

The court appears to reach its conclusion by a two-prong path. First, it states there is some uncertainty or ambiguity appearing in the will, and proceeds to apply rules of construction so as to place itself as nearly as possible in the situation of the testator when he made the will, and, giving consideration to that situation, determines as best it can the testator's purpose and the intention he endeavored to convey by the language used. Second, instead of using the language of the testator's will, the court resorts to extrinsic evidence of Anna's quitclaim deed to Charles in 1937, as residuary devisee, executed after the testator's will was probated and the estate administered, and employs language contained therein to ascertain the testator's true intent, and, having attained that intent, it then proceeds to reform the will by excising words of clear and definite meaning and substituting others therefor, so that the language of item X conforms almost identical to the language of Anna's deed, and devises a remainder vested in interest and possession to the children of Constance and Mae Bell upon the death of Charles.

I cannot escape the conclusion that the court's reading of item X is neither interpretation nor construction of words contained in the will, but constitutes nothing less than a plain reformation of the testator's will.

In the first place, I find no uncertainty or ambiguity when all the provisions within the four corners of the will are read together.

Likewise, the court's opinion refers to no doubtful or ambiguous expressions capable of more than one meaning, or to any specific language or clause or inconsistency appearing in the will. Under such circumstances, there is no occasion for applying rules for judicial construction in search of the testator's intention. (*Morse v. Henlon*, 97 Kan. 399, 155 Pac. 800; *National Life Ins. Co. v. Watson*, 141 Kan. 903, 44 P. 2d 269.)

In the second place, while the parties' stipulation of fact included Anna's deed to Charles, and it is a part of the record, any apparent inconsistency or ambiguity with respect to item X arises solely from language in the deed which, as indicated, was executed after the testator's will was probated and the estate administered under it. Under such circumstances, the use of Anna's deed by the court as extrinsic evidence to ascertain the testator's testamentary intent is wholly unwarranted. In *Phillipson v. Watson*, 149 Kan. 395, 87 P. 2d 567, it was held:

"In construing a will the primary rule to be followed is the will itself, the language used in it, and all parts of it. Evidence tending to show the situation of the testator at the time the will was executed, the nature of his business, the extent of his property, and his family or relatives, may be received if helpful in identifying property or beneficiaries, or to clarify language used by the testator, but not to change the will. *Evidence respecting matters which occurred after the will was executed, and particularly after it was probated and the estate administered under it, is incompetent as bearing upon the construction of the will.*" (Syl. ¶ 3.) (Emphasis supplied.)

This rule has been followed and consistently applied. (*Alexander v. Goellert*, 153 Kan. 202, 206, 109 P. 2d 146; *In re Estate of Schnack*, 155 Kan. 861, 867, 130 P. 2d 591; *In re Estate of Sowder*, 185 Kan. 74, 84, 340 P. 2d 907; *Baldwin v. Hambleton*, 196 Kan. 353, 411 P. 2d 626.) See, also, *Postlethwaite v. Edson*, 102 Kan. 104, 171 Pac. 769, and *Guthrie v. Guthrie*, 130 Kan. 433, 435, 286 Pac. 195.

In passing, I feel compelled to say it is a dangerous practice for the court, under the circumstances which attend, to consider as extrinsic evidence of a testator's intention, a quitclaim deed executed by a residuary devisee to another devisee, which purports to change the language or alter the meaning of an item in the testator's will. I know of no authority in this jurisdiction, or elsewhere, permitting this to be done. One needs but to suggest the fraud and collusion that might arise through deeds executed by one or even many residuary devisees for that purpose.

In my judgment, the language of Anna's deed is completely

incompetent and irrelevant to ascertain the testator's intent, and may not be used for that purpose. Moreover, had the testator made declarations similar to the language contained in Anna's deed prior to his death, the court would still be bound by the language used in the testator's will. See, *Aten v. Tobias*, 114 Kan. 646, 220 Pac. 196, and *Quinton v. Kendall*, 122 Kan. 814, 824, 253 Pac. 600.

In the third place, the foregoing conclusion that the court has reformed the testator's will seems inescapable in view of the fact the court excised from item X the word "surviving" following the word "children" and substituted the word "of" in lieu thereof, and inserted the word "surviving" after Mae Bell's full name, and then inserted the name "Charles" after the word "surviving," which conveys an entirely different intention and accelerates the vesting of the alternative contingent remainder. In *Regnier v. Regnier*, 122 Kan. 59, 251 Pac. 392, it was said that excision is a desperate remedy. In *Sipes v. Pessemier*, 144 Kan. 300, 58 P. 2d 1085, it was held:

"A district court has authority to interpret and construe a will but it has no jurisdiction to reform a will by rejecting words of clear and definite meaning and substituting others therefor, and this is especially true where the words used by the testator are not inconsistent with nor repugnant to the remaining provisions of the will." (Syl. ¶ 2.)

In *Dyal v. Brunt*, 155 Kan. 141, 123 P. 2d 307, it was held:

"In construing a will at a time when it is known some of the alternative situations provided for therein do not exist, the court is not authorized to excise provisions relating to those situations from the will when a consideration of them would throw some light upon the testator's intentions." (Syl. ¶ 3.)

In *Hoover v. Roberts*, 144 Kan. 58, 58 P. 2d 83, it was said:

"In support of the right to resort to extrinsic evidence to determine testator's intentions and as authority of a court to delete words from the will and to transpose words and substitute conjunctions, we are referred by appellee to *Smith v. Holden*, 58 Kan. 535, 50 Pac. 447; *Regnier v. Regnier*, 122 Kan. 59, 251 Pac. 392; 28 R. C. L. 225, 226, and 2 Schouler on Wills, 6th ed. 1080. A study of these citations will clearly indicate they are not authority for the *reformation* of a will. They are not authority for the excision of words of definite and fixed legal meaning, nor for the substitution of other terms or phrases which convey an entirely different intention and effect a wholly contrary result." (l. c. 61.)

It was further said, "The district court was without jurisdiction to reform the will," and it would seem to follow this court has no more jurisdiction to do so than a district court. In *Holmes v. Campbell College*, 87 Kan. 597, 125 Pac. 25, it was held:

"The court has no power to reform a will so as to conform to the intentions of the testator shown by external evidence to be different from those expressed in the instrument." (Syl. ¶ 1.)

What the court has done is to substitute that part of Anna's deed vesting the alternative remainder over to the children of the two daughters upon the death of Charles, for that part of the language of item X of the will devising an alternative contingent remainder which is to vest upon the condition of their surviving Mae Bell. The only difference between the language of the deed and the court's conclusion are the words "who shall survive said Charles" following Mae Bell's full name in the deed, and the words "surviving Charles" in the court's opinion. It is submitted this is nothing less than reformation of the testator's will.

In my judgment, the opinion of the court seriously limits the authority of several decisions, particularly *Hoover v. Roberts,* supra; *Dyal v. Brunt,* supra; *Holmes v. Campbell College,* supra; *Sipes v. Pessemier,* supra, and *Phillipson v. Watson,* supra, indeed if it does not overrule them. If those cases are to be overruled, we owe it to the district courts, attorneys and litigants of this state to say so, positively; or if their authority is to be limited only, to point out definitely the extent of such limitation.

While the ascertainment of the intention of the testator is the polestar in interpreting a will, fixed rules of property or those relating to future interests therein should not be disregarded. Every testator, when he uses legal language having a common and accepted meaning, should be supposed to use it in its legal sense, unless he plainly declares otherwise. If courts should indulge an unlimited latitude of forming conjectures on wills by continually placing themselves in the position of the testator to ascertain his intentions, instead of attending to their grammatical and legal construction, the consequences must be endless litigation. If we depart from the established rules of interpretation, without an abiding conviction the meaning of the testator's will requires that we do so, no interpretation, with respect to the title to an estate that depends upon a will can be safe until it has received the approval of the court. Lawyers and testators of the state should be able to rely with confidence upon rules of property in preparing and executing wills, and be assured the intent of the testator as expressed therein will be carried out, instead of a will being made the instrument of introducing a vague discretionary law formed upon the occasion

from the circumstances, to which no precedent can be applied, and from which no rule can be deduced.

In view of the foregoing, I am compelled to dissent from that part of the court's opinion construing the testator's will. This requires me to interpret the testator's will as I understand it from its four corners, and to state my conclusions.

As indicated in the court's opinion, Anna survived the testator, and died October 7, 1950. The discussion following relates only to the life estates devised to the testator's three children, and to the remainders in fee devised to his grandchildren.

The scheme of the testator's will is perfectly simple. His dominant purpose was to fully provide for his wife for her life and at her death, to place his estate in the hands of each of his three children for their lives and to vest the fee simple title in only those of his grandchildren who should survive his children. The gifts over of the fee to his grandchildren were the principal thing in the testator's mind, and the life estates were a mere charge on those gifts. He did not create vested remainders in any of his grandchildren, but, instead, deferred vesting the fee until their parents, his daughters and son, died. This is evident from a consideration of various items of the testator's will.

By item VIII Mae Bell was devised a life estate to the real property described therein "with remainder over in fee simple to *such of the children* of Mae Bell . . . *as shall survive her.*" As indicated in the court's opinion, Mae Bell is still living; had four children, two of whom predeceased Charles, and two of whom are still living and are of lawful age.

By item IX Constance was devised a life estate in the real property described therein "with remainder over in fee simple to *such of the children* of Constance . . . *as shall survive her.*" Constance died on June 27, 1949, survived by two children, a daughter and a son, who are still living and are of lawful age. At her death, the fee title to the property devised in item IX vested in interest and possession in her son and daughter who survived her.

By item X Charles was likewise devised a life estate in the real property described therein, with remainder over in fee simple "to the lawful issue of said Charles . . . *who may survive him,*" but the remainder was additionally limited to those of his issue "born in wedlock." Realizing that Charles might not have issue of the character defined, and desiring that the fee to the property

devised be vested only in his grandchildren, the testator provided an alternative method for vesting the fee: "that in the event said Charles . . . shall die without such issue," then "the remainder in fee simple to the children *surviving my daughters,* Constance . . . and Mae Bell . . . per capita, share and share alike." Charles died on February 5, 1964, without being survived by issue "born in wedlock," and the first remainder failed. Did the fee vest in the alternative remaindermen upon Charles' death?

Before discussing the legal questions involved, it should further be noted the testator subjected the alternative remainder devised to the children surviving Constance and Mae Bell in item X, to the payment of a bequest of $50,000.00 to Margaret Smyth, the then wife of Charles, if she survived him, to be paid in the manner indicated. Item XII expressly recognized the bequest in favor of Margaret, or to her daughter Barbara (her daughter by a previous marriage), was a "contingent bequest." It should also be noted the testator further evidenced his intent to preserve intact the fee title devised to the grandchildren in items VIII, IX and X, by providing that until the termination of the life estates, the life tenants were restricted from selling, mortgaging or otherwise disposing of their interest, nor could the property be subjected to their debts by execution, garnishment or attachment, or be partitioned.

The ablest English and American text-writers agree that a remainder of the character devised in items VIII, IX and X are contingent (Kales Estates, Future Interests, 2d ed., § 345, p. 364—to A for life, remainder to such of his children as survive him; Gray, The Rule Against Perpetuities, 3d ed. p. 86—to A for life, remainder to such of his children as survive him; Leake on Property in Land, 2d ed., p. 235—to A for life, with remainder to such children as he shall leave at his decease; Anno. 57 A. L. R. 2d, 202—to A for life, remainder at his death to his children then surviving or then living [or expressed in equivalent words and without further language or features to modify the construction] gives the children interests which are wholly contingent until the life tenant's death), and this court is of the same opinion. (*Purl v. Purl,* 108 Kan. 673, 676, 197 Pac. 185; *Kirkpatrick v. Kirkpatrick,* 112 Kan. 314, 211 Pac. 146; *McCartney v. Robbins,* 114 Kan. 141, 217 Pac. 311; *Martin v. Lassen,* 122 Kan. 406, 251 Pac. 1083; *Walker v. Row,* 132 Kan. 564, 296 Pac. 699; *Hickcock v. Skelly Oil Co.,* 197 Kan. 1, 10, 11, 414 P. 2d 67.)

Several estates may be limited in the alternative by way of contingent remainder after one particular estate in freehold, in such a way that one may take effect if the other does not. Such remainders are sometimes known as "alternative remainders," and sometimes as "remainders on a contingency with a double aspect." (2 Tiffany, Real Property, § 333, p. 56.) The authorities are agreed that the remainders in fee, such as are devised by item X, are alternative contingent remainders. (1 Fearne on Remainders, pp. 225, 373; 1 Simes and Smith, The Law of Future Interests, § 149, p. 162; Moynihan, Introduction to the Law of Real Property, p. 124; 2 Tiffany, *op. cit., supra,* 3d ed., § 333, p. 55; Tiffany, Outlines of Real Property, § 107, p. 125; 28 Am. Jur. 2d, Estates, § § 302, 303, pp. 492-495.)

The leading case on the subject is *Loddington v. Kime,* 1 Salk, 224. While this court has not previously recognized the doctrine of alternative contingent remainders (perhaps because it has not been called upon to do so, it being necessary only to determine that the first remainder following the expiration of a particular estate of freehold was a contingent remainder), cases decided by the court have contained limitations of the character of an alternative contingent remainder. In *Schwarz v. Rabe,* 129 Kan. 430, 283 Pac. 642, the devise was—to A for life, and then to her children if she have any surviving her, if none, then to the children of B (held, contingent remainder); in *Knutson v. Hederstedt,* 125 Kan. 312, 264 Pac. 41, the devise was—to A, if he died leaving children, to such children, if he died leaving no children, to the heirs of the testator then living (held, contingent remainder). See, also, *Gardner v. Anderson, Trustee,* supra; *Purl v. Purl,* supra; *Farmers State Bank v. Howlett,* 126 Kan. 610, 270 Pac. 605. Compare, *Klingman v. Gilbert,* supra.

In the instant case, the alternative remainders are limited upon two different conditions. The first remainder is contingent upon the condition that Charles have lawful issue born in wedlock who survive him, and the alternative remainder is necessarily contingent upon Charles' death, and also that there be children *surviving* Constance and Mae Bell. It is uncertain which of the children, if any, will survive Mae Bell, and until her death, the fee does not vest in the remaindermen. Under the circumstances which attend, had Constance and Mae Bell predeceased Charles, the alternative contingent remainder would have vested in interest and possession

upon the death of Charles. However, the fact that Mae Bell survived Charles creates a gap in the estates expressly created by the testator's will, and pursuant to the common-law rule of destructibility, a contingent remainder would fail if it did not vest at or prior to the termination of the preceding estate of freehold. But this presents no problem where the rule of destructibility of contingent remainders does not exist. (Kales Estates, *op. cit., supra,* § 105, p. 100.)

The common-law rule of destructibility of contingent remainders has been judicially repudiated in this state in the sense that a freehold estate in remainder to commence in the future may be created without a particular estate to support it. (*Miller v. Miller,* 91 Kan. 1, 136 Pac. 953; *McCartney v. Robbins,* supra; *Dyal v. Brunt,* supra; *Platt v. Woodland,* 121 Kan. 291, 295, 246 Pac. 1017.) See, also, 1 Simes and Smith, *op. cit., supra,* § 209; 28 Am. Jur. 2d, Estates, § 322; 20 J. B. K. 174; 43 Minn. L. Rev. 13. It follows that a contingent remainder will not be destroyed by reason of its not vesting at or prior to the termination of the preceding estate of freehold. Hence, the fact that the alternative contingent remainder did not vest at or prior to the termination of Charles' life estate does not destroy it, but it continues as a valid limitation until such time as the contingency either occurs or fails to occur.

The inheritance or fee during the period intervening between the creation and the time of vesting of a contingent remainder remains in the grantor or testator, and is known as the reversion. The estate in reversion is the residue of an estate left in the grantor or testator to commence in possession after the termination of some particular estate granted out by him. It is a future estate created by operation of law to take effect in possession in favor of the grantor or testator after the termination of a prior particular estate granted or devised. The authorities agree that upon a grant or devise of a particular estate of freehold limited to terminate upon the happening of an event which is certain to occur, with a contingent remainder over, there remains in the grantor or testator, a reversion, subject to being defeated by the happening of the contingency upon which the remainder is conditioned. (2 Tiffany, Real Property, 3d ed. § 332, p. 54; Simes and Smith, *op. cit., supra,* § 85, p. 70; Gray, *op. cit., supra,* 4th ed. §§ 113, 113.1; Tiffany, Outlines of Real Property, § 106, p. 124; Moynihan, Introduction to Real Property, § 19, p. 124; Kales Estates, *op. cit., supra,* p.

803.) See, also, *Carter v. Lewis*, 364 Ill. 434, 4 N. E. 2d 853, 108 A. L. R. 458; *Copenhaver v. Pendleton*, 155 Va. 463, 155 S. E. 802, 77 A. L. R. 324; *McKenna v. Seattle 1st Nat. Bank*, 35 Wn. 2d 662, 214 P. 2d 664, 16 A. L. R. 2d 679.

Gray, *op. cit., supra*, 4th ed. § 113 and 113.1, states the following:

"All reversions are vested interests. From their nature they are always ready to take effect in possession whenever and however the preceding estates determine.

"When a reversion is assigned, it continues to be a vested interest with the assignee. . . ."

The authorities also recognize that a reversion in fee is such an estate as may be devised by the testator in a residuary clause, and when so devised there is no question that the fee, until the remainder vests, is in the residuary devisee and not in his heirs at law. (2 Tiffany, Real Property, § 332, p. 55; Gray, *op. cit., supra*, 4th ed. § 113.1, pp. 102, 104; Moynihan, *op. cit., supra*, § 19, p. 124; Simes and Smith, *op. cit., supra*, § 85, p. 70; Kales Estates, *op. cit., supra*, § 304, p. 320; Tiffany, Outlines of Real Property, § 106, p. 124.)

In Kales Estates, *op. cit., supra*, § 105, the rule is stated that in all cases where no rule of destructibility of contingent remainders exists and the event which vests an alternative contingent remainder happens *after* the termination of the preceding estate of freehold, there would be a gap in the estates expressly limited, and the future interest, when it vests, would cut short the reversion in fee in possession.

In summary, and applying the legal principles discussed, item X of the testator's will left in him the reversion in fee which he devised to Anna in the residuary clause by item XII. Thereafter, and in 1937, Anna, first reserving unto herself a life estate, conveyed by quitclaim deed to Charles a life estate in the property described in item X, with remainder over in fee simple to his lawful issue who may survive him, and if he die without such issue, then the remainder "in fee simple to the children of my daughters, Constance . . . and Mae Bell . . . who shall survive Charles, . . . per capita, share and share alike," subject, however, to the payment of $50,000.00 devised to Margaret Smyth. As we have seen, Anna's quitclaim deed was ineffective to change or alter the testator's will, since it had been admitted to probate and the estate administered under it. However, that deed conveyed any present existing interest Anna had in the property, which included

the reversion in fee to the property described in item X. The fact that she reserved a life estate did not alter the conveyance of the reversion in fee to Charles for life and to the designated remaindermen.

When Anna died in 1950, Charles became vested with full ownership of the reversion in fee for his life, but he was already in possession of the property and receiving the rents and profits therefrom, and from a practical standpoint, the reversion in fee added little to his estate. His warranty deed to his wife, Betty, in 1963, conveyed only his interest in the property for his lifetime, and upon his death, that estate terminated. Not being survived by lawful issue, the children of Constance and Mae Bell who survived Charles were vested with full ownership of the reversion in fee under Anna's deed, entitling them to possession and management of the property and to receive the rents and income therefrom, until the alternative contingent remainders vest, subject, however, to the payment of the sum of $50,000.00 to Margaret Smyth as directed in Anna's deed. Payment of this bequest should be made as directed by both the deed and the will. See, *McCartney v. Robbins,* supra.

This, then, is the situation: Charles is dead, and it is unnecessary to consider whether the merger of his life estate and the reversion in fee vested in him the fee title to the property for his lifetime. The four children of Constance and Mae Bell who survived Charles are now the owners of the reversion in fee, and, likewise, are the devisees of an alternative contingent remainder by item X, which will vest the fee simple title to the same property in those children who survive Mae Bell.

In my judgment, the doctrine of merger should not be applied to these separate estates since it would be inconsistent with item X of the testator's will. In *Bullock v. Wiltberger,* 92 Kan. 900, 142 Pac. 950, contingent remainders were present and the doctrine was not applied, it being said the doctrine is purely a matter of theory and ought not be employed to defeat the intent of the testator. To illustrate, should one of the four grandchildren predecease Mae Bell and the doctrine of merger be applied, the surviving husband or wife, as the case may be, could inherit at least a part of the fee title of the grandchild's interest before Mae Bell's death, contrary to the testator's intent that the fee simple title not vest until Mae Bell's death.

In my judgment, the foregoing interpretation of the testator's

will and conclusions drawn therefrom with respect to the vested interest of the reversion in fee and the contingent remainder devised by item X of the will, constitutes a practical means of managing and operating the property and of collecting the rents and profits therefrom until the event prescribed by the testator shall vest the fee simple title in the children surviving Mae Bell.

I would reverse the judgment rendered by the district court holding the provisions of item X in violation of the rule against perpetuities, and direct it to enter judgment in conformity with the views herein.

FONTRON, J., joins in the foregoing concurring and dissenting opinion.

denied relief.